UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WALTER G. GAUTHIER                           Civ. No. 04-290-HA

          Plaintiff,                        OPINION AND ORDER

    v.

EASTERN OREGON CORRECTIONAL
INSTITUTION,

          Defendant.

_____

Stephen L. Brischetto
520 S.W. Yamhill Street, Suite 500
Portland, Oregon 97204
      Attorney for plaintiff

Hardy Myers
Attorney General
Patricia Urquart
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
      Attorneys for defendant
HAGGERTY, Chief Judge:

Plaintiff brought this action on February 26, 2004, asserting claims arising from his discharge from employment with the Eastern Oregon Correctional Institution (EOCI). Plaintiff's Complaint initially contained seven claims for relief, but on October 7, 2004, this court dismissed six of plaintiff's claims as barred by state sovereign immunity. Plaintiff's remaining claim is for discrimination based on a perceived disability in violation of the Rehabilitation Act of 1973 (the Rehabilitation Act). On April 6, 2005, defendant filed a Motion for Summary Judgment (Doc. #47) against this claim. The court heard oral argument on July 15, 2005, and took the motion under advisement at that time. For the reasons stated below, defendant's summary judgment motion is denied.

## FACTUAL BACKGROUND

The following facts are presented in the light most favorable to plaintiff, the non-moving party. On March 31, 2003, plaintiff was hired to work as a corrections officer for EOCI. He was seventy-two years old at the time. Prior to beginning work at EOCI, plaintiff was a corrections officer for three years with the State of Missouri.

Superintendent Tony Santos (Santos) hired plaintiff. During the hiring process, when Santos informed Assistant Superintendent of Security, Patrick Anderson (Anderson) of plaintiff's age, Anderson was "a little taken aback by it." Santos Dep. at 35. However, Santos explained to Anderson that he was enthusiastic about plaintiff because Santos' experience with people older than the average age of a correctional employee was that they were more dependable.

Each new corrections officer at EOCI goes through a one-year probationary period, which is considered an extension of the hiring process. The Oregon Department of Corrections Policy 20.4.7, Trial Service Period, provides that: "Trial service is considered an extension of the hiring process. The trial service period affords an employee the

opportunity to demonstrate the ability to perform the work and gives the department the opportunity to determine the employee's qualifications and fitness for the position." Def.'s Ex. T at 1.

The probationary period begins with a two-week orientation, after which each new corrections officer is assigned to a Field Training Officer (FTO), who is responsible for providing the new employees with on-the-job training. The FTOs also complete a daily observation report (DOR) for each day of training, on which the FTOs rank the new corrections officers in thirty-one areas within four categories (appearance, attitude, knowledge, and performance). The FTOs also provide written comments about the strengths and weaknesses of the trainees. The new corrections officers are assigned a different FTO each week for four weeks. After completion of the two-week orientation and the four weeks of training with FTOs, each new corrections officers is assigned to a regular shift for the remainder of the probationary period.

After plaintiff completed the two-week orientation period, he was assigned to FTO Stephen Hoskins (Hoskins). Plaintiff and Hoskins worked together for eight to ten hours per day for five days. On Hoskins' DOR dated April 14, 2003, Hoskins rated plaintiff at an acceptable level for each of the thirty-one questions. Hoskins also commented that "the most satisfactory area of performance of the day" was that plaintiff was "very observant, is willing and able to do shakedowns and property searches. Asks questions about searches and contraband." Brischetto Aff., Ex. C at 2. As to plaintiff's "least satisfactory area of performance of the day," Hoskins wrote: "I observed no areas that require remedial efforts." *Id.*

On April 16, 2003, Hoskins again rated plaintiff at an acceptable level for each of the thirty-one questions. Hoskins wrote that plaintiff "[d]emonstrates good skills in shakedowns

and contraband searches," and Hoskins left the "least satisfactory area" blank. *Id.* at 8. On the DOR dated April 18, 2003, Hoskins again rated plaintiff at an acceptable level for all questions and wrote: "Excellent attitude - asks for feedback - a joy to work with." *Id.* at 4. As to plaintiff's "least satisfactory area of performance," he wrote: "Needs to take more responsibility and follow-through." *Id.* at 4.

On April 19, 2003, Hoskins completed an "End of Phase Evaluation Summary," in which he stated the following about plaintiff: "Attitude is wonderful. Requests FTO feedback. Does great job on searches. Very observant and aware." Brischetto Aff., Ex. D at 1. Hoskins also wrote that plaintiff's only significant weakness was "Not knowing [Oregon Department of Corrections] Rules and Regulations." *Id.* Officer Hoskins indicated that no remedial efforts were needed, and he recommended advancement of plaintiff.

On the last day they worked together, Hoskins told plaintiff that plaintiff should be on guard because he would be watched closely because of his age. Hoskins also told plaintiff that his next FTO, Officer Martin Ray (Ray), would be hard to get along with and would test plaintiff to see how much he knew.

Hoskins apparently gave plaintiff this warning because he had been approached by several EOCI employees about a "rumor" that one of the new officers was seventy-two years old. Hoskins Dep. at 36. At his deposition, Hoskins recalled that a number of officers and at least one sergeant approached him with this rumor. These individuals were concerned that a seventy-two year-old could not adequately perform the job of corrections officer, which Hoskins perceived to be a valid concern in light of the need to run, keep up, and fight as a corrections officer.

After plaintiff finished his training period with Hoskins, other FTOs gave Hoskins "friction" for giving plaintiff such high ratings on his DORs. Hoskins Dep. at 75-77.

Lieutenant D. Mitchell (Mitchell), Ray, and Corporal Captare Swafford (Swafford) told Hoskins that he rated plaintiff too highly and that plaintiff was not doing what he was told, did not follow directions, made mistakes, was argumentative, and would not take directions.

From April 20-26, 2003, Ray was plaintiff's FTO. However, Ray and plaintiff spent only eight to ten hours together during that week. Plaintiff was assigned to work with other officers for the remaining time. Throughout the week, Ray criticized plaintiff during training sessions, in his DORs, and in his End of Phase Evaluation Summary. In each DOR, Ray rated plaintiff as "not acceptable" in multiple areas. *See* Brischetto Aff., Ex. E at 1-10. Ray also provided substantial comments on each DOR documenting areas of performance that were not satisfactory. For example, Ray wrote that:

> [Plaintiff] while conducting pat down searches was allowing inmates to walk right behind him. I saw this on two occasions, when I pointed this out and instructed him to move back away from the line, move the inmate to a safer area, then conduct [a] search, then officer Gauthier made an excuse that he told them not to. I observed inmates walk behind him while he was bent over and did not observe any directive from him to the inmates.

*Id.* at 10. Plaintiff did not experience any problems with other officers during this week. At the end of the week, Ray recommended that plaintiff be discharged.

Prior to this, on April 20, 2003, plaintiff complained to Captain Michael Burcham (Burcham) that his age was well-known throughout EOCI and that an officer had told him he was being singled out because of his age. Burcham did not ask plaintiff which officer he was referring to. According to plaintiff, plaintiff also told Burcham that Ray was trying to set him up and was singling him out for criticism he did not deserve. This fact is disputed by Burcham, who testified that plaintiff did not mention any names during this conversation. Burcham testified that if plaintiff had mentioned Ray's name during this meeting Burcham would have followed up on the complaint. Plaintiff asserts that Burcham told plaintiff he

would follow up on his concerns about his age being well-known, that he would speak with Ray, and that he would get back to plaintiff. Burcham did not forward plaintiff's complaint to anyone else in management, nor did he follow up with plaintiff.

It appears that Burcham did in fact speak with Ray, as Ray commented in one of plaintiff's DORs that plaintiff "told Capt. M. Burcham that I was picking on him." Brischetto Aff., Ex E at 8. In addition, in a memorandum to Anderson on April 27, 2003, Ray stated that plaintiff did not accept criticism of his performance, that plaintiff went to Captain Burcham to complain that Ray was picking on him, and that plaintiff made mistakes and then denied responsibility for them. Ray also reported that he had met with plaintiff to discuss these issues and that he thought plaintiff's training was not working.

From April 29, 2003 through May 1, 2003, Swafford was plaintiff's FTO. In his DOR dated April 29, 2003, Swafford rated plaintiff's performance as acceptable in all areas he observed except "Officer Safety Generally." Brischetto Aff., Ex. Q at 5. Swafford described plaintiff's most satisfactory area as, "Officer Gauthier's boot's [sic] are polished well." *Id.* Swafford described plaintiff's least satisfactory area as follows: "Officer Gauthier while performing clothed search of an Inmate exposed his head and upper body area to the inmate. I had explained to C/O Gauthier the correct procedure unfortunately I had to leave to man the West Observation Post, so I could not observe any further shake downs." *Id.*

In his DOR dated April 30, 2003, Swafford rated plaintiff's performance as acceptable in all areas he observed except for "Orientation-response to Calls/facility Orientation," and "Officer Safety Generally." *Id.* at 3. Swafford again described plaintiff's most satisfactory area as, "Officer Gauthier's boot's [sic] are polished well." *Id.* at 6. Swafford described plaintiff's least satisfactory area as follows:

> While running G3 housing Officer Gauthier appeared thoroughly confused, and disoriented when approached with routine tasks. The Inmates began to attempt to take advantage of his focus on 1 task and while he was occupied, attempted to engage in disobeying unit rules. Officer Gauthier answered the telephone, and forgot who called and why.

*Id.*

In a DOR dated May 1, 2003, Swafford rated plaintiff as acceptable in all areas except "Orientation-response to Calls/facility Orientation," "Field Performance Non-Stress Conditions," and "Officer Safety General." *Id.* at 1. Swafford described plaintiff's most satisfactory area as that he "remembered the telephone number for Control Center." *Id.* at 2. Swafford described plaintiff's least satisfactory area as follows:

> Officer Gauthier left the bar box unattended on three different occasions, two times after I had gone over the procedures and reasons why it is essential for the Cell Locking controls to remain secured from Inmate contact. Officer Gauthier then set the Unit Keys on the officers [sic] desk and walked away from them. I instructed him that this was an unsafe procedure and about 1 hour later Officer Gauthier placed the Unit Keys on the desk again while talking to an Inmate.

*Id.*

During the time Swafford was plaintiff's FTO, Hoskins testified that he twice heard people trying to contact plaintiff on the radio and plaintiff was not responding. Hoskins also stated that he once found plaintiff on a stairwell appearing confused, that he became concerned about plaintiff's health, and that he called Swafford to report these concerns. Hoskins testified that these incidents changed his perception of plaintiff.

On April 29, 2003, plaintiff was asked to attend a meeting with Santos, Mitchell, and Captain Ken Crawford (Crawford). Plaintiff was asked to disclose the name of the individual who told him he was being singled out because of his age, but plaintiff refused to disclose Hoskins' name.

On April 30, 2003, plaintiff was called into a meeting with Mitchell, Crawford, and

Swafford, at which plaintiff stated that he had been told he was being pegged because of his age and that Ray was singling him out and treating him poorly. Plaintiff again refused to disclose Hoskins' name during this meeting, but, afterward, wrote a two-page letter in which plaintiff ultimately stated that it was Hoskins who informed him of the rumors about his age. Mitchell then asked Hoskins to document his prior conversation with plaintiff, which Hoskins did in a memorandum dated April 30, 2003. In this memorandum, Hoskins wrote that several employees, including Sergeant Gary Myers, had asked him if he had a seventy-two year-old trainee. No one from management discussed this issue with Hoskins after he wrote the memorandum.

On May 2, 2003, plaintiff was discharged. Santos and Anderson signed plaintiff's discharge letter, which stated that plaintiff "failed to demonstrate the competence and/or fitness for the position of Correctional Officer at this facility." Brischetto Aff., Ex. B. Santos testified that he discharged plaintiff because he perceived him to be a danger to himself and to others. This perception was informed largely by the negative evaluations and concerns submitted by Hoskins, Ray, and Swafford. Santos was also aware of the rumors among staff at EOCI that there was a seventy-two year-old trainee, and he knew that some people were concerned that a seventy-two year-old could not function adequately. Santos testified that the fact that Ray's evaluation of plaintiff was very different from Hoskins' evaluation raised a "red flag" because it "shows disparate treatment," Santos Dep. at 66, and that it was improper for FTOs to give "friction" to Hoskins because of his evaluations of plaintiff. *Id.* at 119-120.

After his discharge from EOCI, plaintiff returned to his work as a corrections officer with the State of Missouri. Plaintiff's performance evaluations continue to rate him as "highly successful" in this position.

## STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see Bahn v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party carries the initial burden of proof and meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

The court must view the evidence in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citations omitted). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005) (citation omitted). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981) (citing Fed. R. Civ. P. 56(c)).

Deference to the non-moving party does have some limits. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of the [non-moving party's] position would be insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The Rehabilitation Act

Section 504 of the Rehabilitation Act, codified as 29 U.S.C. § 794, prohibits discrimination against otherwise qualified disabled persons under any program or activity receiving federal financial assistance. The Ninth Circuit has "recognized a private right of action under section 504, and plaintiffs suing under section 504 may pursue the full panoply of remedies, including equitable relief and monetary damages." *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107 (9th Cir. 1987) (citations omitted).

Claims brought under Section 504 are subject to the enforcement provisions of Title I of the Americans with Disabilities Act (ADA). 29 U.S.C. § 794(d). Title I of the ADA, in turn, has adopted the "powers, remedies and procedures" of Title VII, as set forth in 42 U.S.C. 2000e. 42 U.S.C. § 12117. Therefore, this court applies the analytical framework used in Title VII cases to the situation here. *See Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir. 1990) (where the plaintiff does not seek a special accommodation, but instead alleges discrimination based on discriminatory intent, and where the defendant disavows any reliance on the plaintiff's handicap, a court should apply the analytic frameworks employed in Title VII).

In order to establish a prima facie case of a Section 504 violation, a plaintiff must show that: (1) he or she is a handicapped person under the Act; (2) he or she is otherwise qualified to serve in the relevant position; (3) the employer is federally funded; and (4) he or she was denied employment because of the handicap. *See Greater Los Angeles,* 812 F.2d at 1107 (citing *Bentivegna v. U.S. Dep't of Labor,* 694 F.2d 619, 621 (9th Cir.1982)); *see also Smith,* 914 F.2d at 1339.

As in Title VII cases, if the plaintiff establishes a prima facie case for a Section 504 violation, the burden-shifting framework set forth in *McDonnell Douglas Corporation v.*

*Green,* 411 U.S. 792, 802-04 (1973) applies.  *See Snead v. Metro. Prop. & Cas. Ins. Co.*,

237 F.3d 1080, 1090-94 (9th Cir. 2001).  Under *McDonnell Douglas,* once a plaintiff

demonstrates a prima facie case of discrimination, the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* at

1093-94.  If the defendant does so, the burden shifts back to the plaintiff to produce

evidence that the articulated reason is pretextual.  *Id.*  If the plaintiff meets this burden,

summary judgment must be denied.

## ANALYSIS

Defendant argues that plaintiff has failed to establish a prima facie case of

discrimination under the Rehabilitation Act.  Even if plaintiff can establish a prima facie

case, defendant asserts that it had a legitimate, nondiscriminatory reason for discharging

plaintiff:  he did not meet performance standards, attempted to explain away his deficiencies

by casting blame on others, and was insubordinate.  The court examines each aspect of the

*McDonnell Douglas* framework in turn.

## A.  Plaintiff's prima facie case

Defendant argues that plaintiff cannot establish the first, second, or fourth elements

of his prima facie case.  Defendant does not dispute the third element.

## 1.  Is plaintiff handicapped under the Act?

The Rehabilitation Act defines the term "individual with a disability" as meaning any

person who:

> (I) has a physical or mental impairment which substantially limits one or more
> of such person's major life activities;
> (ii) has a record of such an impairment; or
> (iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).  The Department of Health and Human Services (DHHS) defines

"major life activities" as meaning "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii).

There are two ways in which an individual may fall within the "regarded as" definition of an individual with a disability: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Both situations involve an employer having misperceptions about the individual, which "often resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." *Id.* at 489 (internal quotations and citations omitted).

Here, plaintiff argues that he was "regarded as" having a disability that substantially limited the major life activities of work because EOCI employees erroneously perceived him as suffering from mental and physical disabilities associated with advanced age. For an impairment to substantially limit one's ability to work, the individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3).

Defendant argues that plaintiff has failed to establish that defendant regarded him as substantially limited in work because he has not put forth any evidence that Santos, or any other administrator of the State of Oregon, ever considered or determined that plaintiff was a poor fit for any job other than his position as corrections officer at EOCI.

### a. Did EOCI employees regard plaintiff as disabled?

Plaintiff asserts that Hoskins, Ray, and Swafford perceived plaintiff as disabled due to physical and mental impairments associated with age. Plaintiff supports his argument with expert testimony that age stereotyping is a form of prejudice and that common stereotypes are that older individuals: lack physical vigor, health, and vitality; move slowly and have difficulty running; have compromised physical sense; are mentally and intellectually slow; are easily confused, overwhelmed, and flustered; and have difficulty thinking clearly. Gwartney Decl. at 2-3.

As to Hoskins' perceptions, plaintiff presents evidence that while plaintiff still worked at EOCI, Hoskins stated that he observed plaintiff appearing to be lost and confused and, therefore, called Swafford to ask if plaintiff was okay and if he had noticed any problems. Hoskins stated that, "[a]t that point, I was concerned for Mr. Gauthier's health." Hoskins Dep. at 71. After plaintiff was discharged, Hoskins reported to the Oregon Bureau of Labor and Industries (BOLI) that he recalled two occasions where there were radio calls asking where plaintiff was and another two occasions where Hoskins saw plaintiff wandering around "as though lost or confused." Brischetto Aff., Ex P at 3. Hoskins reported to BOLI that:

> One of those incidences is very clear in [Hoskins'] mind because he talked to Swafford about it. [Plaintiff] had seemed confused or totally lost. [Hoskins'] grandfather had recently suffered from dementia and passed away. As a result of that, it was [Hoskins'] gut feeling that [plaintiff] was suffering from the same problem.

*Id.* As plaintiff argues, Hoskins' interpretation of plaintiff's behavior was to associate the health problems of one person, his grandfather, in a common group (older persons) with another person in the same group. This is a common form of stereotyping. Gwartney Decl. at 9.

Plaintiff also presents evidence that Swafford perceived plaintiff as being handicapped by mental and physical disabilities caused by advanced age. In Swafford's DORs, he wrote that plaintiff was "thoroughly confused, and disoriented when approached with routine tasks" and that when he answered the phone and forgot who called and why. Brischetto Aff., Ex. Q. Swafford described plaintiff's behavior at the meeting on April 29, 2003, as "carrying on," "rambling," and interruptive. *Id.*, Ex. G at 1. Swafford testified that he described plaintiff in this way because he could not understand plaintiff, because plaintiff's thoughts shifted back and forth, and because plaintiff was not making sense. Swafford Dep. at 40, 42. Swafford described plaintiff as confused and disoriented because when someone asked plaintiff to do simple tasks, plaintiff "would stare blankly" at that person as if he did not know what they were talking about. *Id.* at 57.

Swafford's perceptions of plaintiff's mental functioning are consistent with an individual who perceives another as suffering from dementia, senility, or Alzheimer's disease, each of which is a cognitive impairment associated with aging. Gwartney Decl. at 7; Pennington Decl., Ex. A at 3 (defining "dementia" as multiple cognitive disorders that include a memory impairment and which are sufficiently severe to cause impairment in occupational or social functioning).

Plaintiff also presents evidence that Ray believed plaintiff was suffering from an impairment commonly associated with advanced age, because he described plaintiff as slow to react, easily overwhelmed when things were busy, unable to prioritize, and as justifying mistakes by offering excuses. Plaintiff argues that these criticisms were pretextual because Ray had "set up" plaintiff to be criticized. For example, in one instance Ray directed plaintiff to move to a position in which offenders would go behind his back, and then Ray criticized plaintiff for permitting offenders to go behind his back. Ray also criticized

plaintiff for calling to light this type of inconsistency, which Ray characterized as making excuses and being argumentative.

Plaintiff has also submitted evidence that the perceptions of him as having a disability due to his age were false. For example, psychiatric nurse Ann Pennington (Pennington) testified that plaintiff does not suffer from dementia. Pennington Decl. at 2. Pennington also stated that she has observed plaintiff's functioning for several years and that the observations reported by the FTOs are inconsistent with her own; namely, she stated that plaintiff is not confused, disoriented, excessively forgetful, argumentative, or unable to take constructive criticism. *Id.* Pennington stated that plaintiff is "intelligent, healthy, capable, experienced and a person of high moral values and integrity." *Id.* at 2-3.

### b. Did EOCI employees regard plaintiff's disability as substantially limiting?

Plaintiff must show not just that defendant regarded him as having a disability, but that defendant regarded him as having a disability that substantially limited a major life activity. To meet this burden, plaintiff submitted a Declaration from Richard Ross (Ross), a vocational rehabilitation expert who was asked to evaluate whether defendant's perception of plaintiff would substantially limit him in the major life activity of work. Ross Decl. at 1. After examining the depositions, memoranda, and other evidence in this case, Ross submitted testimony that the FTOs' perceptions of plaintiff as being "confused, disoriented, forgetful, and unable to stay on tasks would be considered a substantial vocational handicap." *Id.* at 2. Ross described the position of corrections officer as semi-skilled and stated that if the FTOs' descriptions of plaintiff were accurate, plaintiff:

> would be precluded from working in jobs that require independent decision-making and he would be precluded from working in jobs that require close supervision. There are a substantial number of jobs in the semi-skilled jobs category which he would be precluded [sic] performing by such a vocational handicap. Examples of such jobs are corrections work, law enforcement

work, security work, taxi and delivery driver and retail sales work.

*Id.*

Ross' report is relevant to the issue of whether defendant regarded plaintiff as disabled. *See Deppe v. United Airlines*, 217 F.3d 1262, 1266 (9th Cir. 2000) (district court abused its discretion in excluding a vocational expert's report in a "regarded as" disability claim). Ross indicates that if the perceptions by EOCI employees were true, plaintiff would be precluded from a broad class of work, namely all corrections and law enforcement jobs. The situation here is similar to that in *Deane v. Pocono Medical Center,* 142 F.3d 138, 145 (3d Cir. 1998) (en banc), where the Third Circuit held that a vocational expert's report was sufficient to raise a triable issue of fact as to "regarded as" disability. In *Deane*, the vocational expert's report indicated that if the plaintiff had been impaired to the extent allegedly perceived by her employer, the plaintiff would have been precluded from employment both within her chosen profession (nursing) and within a wide range of jobs within her geographic region. *Id.* at 145. The Ninth Circuit has relied on this case. *Deppe*, 217 F.3d at 1266. Like in *Deane*, plaintiff here has put forth sufficient evidence to raise a triable issue of fact as to whether he was "regarded as" having a disability that substantially limited the major life activity of work.[1]

2. Is plaintiff "otherwise qualified" to serve in the relevant position?

An "otherwise qualified" individual is "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397,

---

[2] Defendant argues that because Santos was the decision-maker in plaintiff's discharge, plaintiff must put forth evidence that Santos himself regarded plaintiff as substantially limited in a major life activity. For reasons provided more fully in the next section of this Opinion and Order, the court finds that it is sufficient for plaintiff to raise a triable issue of fact as to whether any EOCI employees who impacted the ultimate decision to discharge plaintiff regarded him as disabled.

406 (1979). Therefore, plaintiff must show that he is capable of performing the essential job duties of the corrections officer position. *See Reynolds v. Brock,* 815 F.2d 571, 573 (9th Cir. 1987).

Here, plaintiff has put forth substantial evidence showing that he is able to perform the essential functions of a corrections officer. For example, prior to his employment at EOCI, plaintiff worked as a corrections officer for three years for the Missouri Department of Corrections (MDC), where he was rated as "highly successful." Gauthier Decl., Ex. A at 1. After plaintiff was discharged by defendant, he was rehired as a corrections officer with MDC, where he continues to work and again has been rated as "highly successful." Gauthier Decl. at 2 and Ex. C at 1.

In addition, prior to being hired by defendant, plaintiff submitted to a physical examination after which the physician was required to indicate whether plaintiff was "physically able to perform the duties of a law enforcement officer as prescribed by [the Department of Public Safety Standards and Training]." OAR 259-008-0010(8)(g). After he obtained a hearing aid, plaintiff met all of the physical, mental, and emotional standards for the corrections officer position.

In light of this evidence, as well as the fact that plaintiff successfully completed two weeks of orientation and received very positive feedback during his first week at EOCI, the court finds that plaintiff has established that he is "otherwise qualified" for the position of corrections officer.

3. Was plaintiff discharged because defendant regarded him as an individual with a disability?

Defendant argues that plaintiff has failed to put forth any evidence that Santos, who made the decision to discharge plaintiff, was improperly influenced by the rumors and

remarks about plaintiff's age. In fact, there is evidence that Santos viewed plaintiff's age as a positive attribute because he associated it with experience and maturity. Therefore, defendant asserts that this court must recognize a strong inference that plaintiff's discharge was not based on discrimination. *See Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) ("where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive").

The court finds that this inference does not arise here because Santos' decision to discharge plaintiff was based on evaluations completed by other EOCI employees. Therefore, the issue is not whether plaintiff has shown discriminatory intent on behalf of Santos, but whether plaintiff has shown discriminatory intent on the part of the EOCI employees who completed the evaluations Santos' relied on in making his decision. As the Ninth Circuit explained in *Lam v. University of Hawaii*, 164 F.3d 1186, 1188 (9th Cir. 1999), *as amended* (referred to as *Lam II*), discrimination at one stage of an employment process may infect the ultimate employment decision, and "impermissible bias at any point may be sufficient to sustain liability." (quoting *Lam v. University of Hawaii*, 50 F.3d 1551, 1560-61 (9th Cir. 1994), *as amended (*referred to as *Lam I*)). Furthermore, while "[s]tray remarks not acted upon or communicated to a decision maker are insufficient to establish pretext," such remarks may well be relevant if they impacted the ultimate decision to discharge the employee. *Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005) ("An agent's biased remarks against an employee because of his or her gender are admissible to show an employer's discriminatory animus if the agent was involved in the employment decision.") (citation omitted).

Plaintiff has put forth evidence that Ray's, Hoskins', and Swafford's evaluations and

reports about plaintiff were based on erroneous age-stereotyped views that plaintiff was suffering from mental and physical disabilities associated with advanced age. This evidence includes Hoskins' concern for plaintiff's health because he appeared to be lost and confused; Hoskins' endorsement of EOCI employees' concerns that a seventy-two year-old might not be able to do the job of corrections officer; Swafford's description of plaintiff as "thoroughly confused, and disoriented when approached with routine tasks" and "rambling"; and Ray's description of plaintiff as slow to react, easily overwhelmed, unable to prioritize, and resistant to change. Plaintiff's argument is also supported by evidence that Ray, Swafford, and Mitchell gave Hoskins "friction" for ranking plaintiff too highly on his evaluations during the first week of training, which Santos himself stated was improper.

Furthermore, Santos' decision to discharge plaintiff was clearly based on these reports. Santos testified that he discharged plaintiff because he was having "major issues regarding supervision of inmates, leaving keys on the desk, not conducting pat-down searches appropriately, basically putting himself in harm's way." Santos Dep. at 45. Santos also pointed to plaintiff's failure to follow instructions, "not accepting criticism well, making statements to the effect that that's not the way we did it in Missouri and general – generally not following sound correctional practices raised a lot of bells and whistles, not only for other people, but for me as well . . . ." *Id.* at 46. While there is evidence that Santos developed his own concerns about plaintiff after meeting with him personally,[2] there is at least a triable issue as to whether Santos would have made the same decision in the absence of the negative evaluations and concerns provided by Hoskins, Ray, and Swafford. Accordingly, the court finds that plaintiff has provided sufficient evidence to establish his

---

[3] As defense counsel herself pointed out during oral argument, Santos would not have had these meetings with plaintiff if not for the negative evaluations.

prima facie case.

## B. Defendant's nondiscriminatory reason

Defendant asserts that plaintiff was discharged because he did not meet performance standards, attempted to explain away his deficiencies by casting blame on others, and was insubordinate. The court finds that this satisfies defendant's burden of articulating a legitimate, nondiscriminatory reason for plaintiff's discharge. Therefore, the burden now shifts back to plaintiff to produce evidence that this reason is actually a pretext for discrimination.

## C. Plaintiff's showing of pretext

In order to survive summary judgment, plaintiff must show that there is evidence that defendant's proffered nondiscriminatory reason is pretextual. A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

"[I]n evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish [his or] her *prima facie* case." *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991). "When that evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment." *Id.* However, it is possible that a plaintiff could establish a prima facie case and yet not put forth sufficient evidence to defeat a motion for summary judgment:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000).

Here, defendant argues that Santos discharged plaintiff based only on Santos' personal interactions with him and his independently-formed determination that plaintiff was not suitable for the position. As stated above, this assertion is contradicted by ample evidence that Santos in fact relied on evaluations and reports infected with erroneous age-stereotyped views that plaintiff was suffering from mental and physical disabilities associated with advanced age. The court has no trouble concluding that plaintiff has established pretext. Accordingly, defendant's summary judgment motion is denied.

## **CONCLUSION**

For the reasons stated above, defendant's Motion for Summary Judgment (Doc. #47) is DENIED.

IT IS SO ORDERED.

Dated this 26  day of July, 2005.


  /s/Ancer L.Haggerty

___

Ancer L. Haggerty
United States District Judge